SUPREME COURT OF ARIZONA
En Banc

| | | |
|---|---|---|
| STATE OF ARIZONA, | ) | Arizona Supreme Court |
| | ) | No. CR-01-0275-AP |
| Appellee, | ) | |
| | ) | Maricopa County |
| v. | ) | Superior Court |
| | ) | No. CR 1999-095294 |
| SHAWN RYAN GRELL, | ) | |
| | ) | |
| Appellant. | ) | **O P I N I O N** |
| _____ | ) | |

Appeal from the Superior Court in Maricopa County
The Honorable Barbara M. Jarrett, Judge

**AFFIRMED IN PART; SENTENCE VACATED;
REMANDED FOR RESENTENCING**

_____

TERRY GODDARD, ARIZONA ATTORNEY GENERAL                    Phoenix
        By   Kent E. Cattani, Chief Counsel,
             Capital Litigation Section
             Amy S. Pignatella Cain,                        Tucson
             Assistant Attorney General
Attorneys for the State of Arizona

JAMES J. HAAS, MARICOPA COUNTY PUBLIC DEFENDER            Phoenix
        By   James R. Rummage, Deputy Public Defender
Attorneys for Shawn Ryan Grell

_____

**B E R C H**, Vice Chief Justice

¶1      Appellant Shawn Grell was convicted of first degree murder in 2000 following a bench trial on stipulated facts. After an aggravation and mitigation hearing, the judge sentenced

Grell to death. While Grell prepared his direct appeal, the United States Supreme Court decided cases that held (1) that juries must find the aggravating factors that allow the imposition of a sentence of death, *Ring v. Arizona* (*Ring II*), 536 U.S. 584 (2002), and (2) that mentally retarded defendants may not be executed, *Atkins v. Virginia*, 536 U.S. 304 (2002). In addition to raising sentencing issues under *Ring*, Grell claimed on appeal that, under *Atkins*, his mental retardation should preclude a death sentence in his case. In lieu of reviewing Grell's sentence for harmless error, this court ordered the trial court to re-examine the issue of Grell's mental retardation, applying the standards articulated in *Atkins*. *State v. Grell* (*Grell I*), 205 Ariz. 57, 63, ¶ 41, 66 P.3d 1234, 1240 (2003). On February 2, 2005, the trial court held another hearing and issued its ruling finding no mental retardation.

¶2 For the appeal, this court ordered the parties to combine briefings on both the sentencing issues and the mental retardation issues. We have jurisdiction under Article 6, Section 5(3) of the Arizona Constitution and Arizona Revised Statutes ("A.R.S.") section 13-4031 (2001). We affirm the trial court's finding that Grell did not prove mental retardation, but remand the case for jury sentencing.

## I.  FACTS[1]

¶3        On December 2, 1999, Shawn Grell picked up his two-year-old daughter, Kristen, from daycare.  They drove around for several hours, during which time Grell bought a plastic gas can and gasoline.  He then drove to a deserted area in Mesa, put his sleeping daughter on the ground, poured gasoline on her, and lit her on fire.  She awoke and stumbled several feet while engulfed in flames before eventually succumbing to the smoke and flames.  Grell drove to a nearby convenience store to buy beer.  He told the clerk he had seen some kids set a dog on fire in a vacant lot.  After driving around for several hours, Grell called the police and turned himself in at five o'clock the next morning.  He later held a press conference at which he admitted killing his daughter.

¶4        Grell was charged with first degree murder and child abuse.  He waived a jury trial and instead the parties submitted to the trial judge a twenty-page narrative with forty-four attachments to serve as a basis for determining guilt.  In September 2000, the judge convicted Grell of first degree murder, but acquitted him of child abuse.

¶5        Grell agreed to the admission of the documents at the

---

[1]   A more complete account of the crime appears in *Grell I*, 205 Ariz. at 58-59, ¶¶ 3-15, 66 P.3d at 1235-36.

sentencing hearing, but attempted to preserve his right to a jury trial on sentencing issues by the following language: "This stipulation shall in no way constitute a waiver of any rights the defendant may have to have a jury empanelled to determine the existence or absence of any aggravating and or mitigating circumstances." When Grell specifically requested that a jury be empanelled for the sentencing proceeding, however, the motion was denied.

## A.   Original Sentencing

¶6      The combined aggravation and penalty phase hearing held in June 2001 included testimony from mental health experts, law enforcement officers, a burn injury expert, and Grell's sister. The State asserted three statutory aggravating factors: that Grell had previously been convicted of a serious offense; that the crime was committed in an especially heinous, cruel, or depraved manner; and that the victim was younger than fifteen years of age. *See* A.R.S. § 13-703(F)(2), (F)(6), (F)(9) (1999). The trial court found all three.

¶7      The prior serious offense was a 1996 conviction for robbery. *See* A.R.S. § 13-703(H) (1999) (identifying robbery as a "serious offense" for purposes of use as a death penalty aggravator). That Kristen was younger than fifteen at the time of the crime was proven by a birth certificate showing her 1997

birthdate, which established that she was two years old at the time of her death.

¶8      Citing the facts that Kristen was conscious when set on fire, that she had to have suffered immense physical pain, and that Grell should have foreseen the pain she would suffer, the court also found the crime "especially cruel."  In addition, while acknowledging that only a finding of cruelty was necessary to satisfy the § 13-703(F)(6) aggravating factor, the court also found the crime heinous and depraved.[2]  The court cited the following factors in making these findings:  (1) the crime was senseless; (2) the victim was helpless; (3) the victim was the defendant's own child; (4) the method of killing ensured that the victim would suffer "unimaginable pain"; (5) the method ensured that the body would be disfigured; and (6) the defendant made comments to a convenience store clerk after the murder about seeing a dog set on fire.[3]  The court stated that these

---

[2]      The "heinous, cruel, or depraved" aggravator is written in the disjunctive and the state need prove only one of the three conditions to trigger application of the aggravating circumstance. *State v. Gretzler*, 135 Ariz. 42, 51, 659 P.2d 1, 10 (1983).  Heinousness and depravity are, however, frequently analyzed together as both involve the defendant's mental state. *Id.*

[3]      The trial court's Special Verdict does not explain the import of this factor, but we infer from the subsequent citation to *Gretzler* that the judge meant that the defendant relished his crime.  *See Gretzler*, 135 Ariz. at 52, 659 P.2d at 11.

- 5 -

facts satisfied the test set forth in *State v. Gretzler*, 135 Ariz. 42, 659 P.2d 1 (1983), and concluded that the manner of killing, in addition to being cruel, was also heinous and depraved.

¶9        In mitigation, Grell alleged the statutory mitigating circumstance of mental impairment, *see* A.R.S. § 13-703(G)(1), as well as non-statutory mitigators of mental retardation, learning disabilities, difficult childhood, and remorse.  Much of the evidence at the hearing centered on Grell's claims of mental impairment, mental retardation, and a cognitive disorder caused by brain damage.

¶10        Drs. Globus and Wicks testified for the defense and Drs. Mayberg and Scialli testified for the State.  On the issues of mental impairment and brain damage, Dr. Globus testified that he initially diagnosed Grell with brain damage before having a PET scan done and before having Dr. Wicks do a blind neuropsychological evaluation of Grell.  Dr. Globus is not certified to read PET scans, and those who prepared the report for him did not testify, facts noted by the court in its sentencing decision.  Dr. Mayberg, the State's neuropsychologist who is qualified to read PET scans, testified that Grell's PET scan showed no brain damage.  Dr. Scialli testified that he found no evidence of a cognitive disorder caused by brain

damage, but instead diagnosed Grell as having only an anti-social personality disorder.

¶11    The trial court ultimately found "no credible evidence" that Grell suffered from brain damage. The court instead accepted Dr. Scialli's diagnosis that Grell suffered from an anti-social personality disorder, symptoms of which include acting impulsively and using poor judgment.

¶12    Drs. Globus and Wicks also testified regarding Grell's mental retardation, as did Dr. Scialli. The court acknowledged Grell's low IQ scores, ranging from 65 to 74, but weighted more heavily Dr. Scialli's testimony that Grell had adequate adaptive skills.[4] In addition, the trial court observed that no one before Drs. Globus and Wicks had ever diagnosed Grell as having mental retardation and that Grell had demonstrated good adaptive skills by maintaining a false identity in order to be charged as a juvenile after he was arrested for robbery in 1996 when he was twenty years old.

---

[4]    The court did not state its criteria for determining mental retardation, but the discussion of IQ scores and adaptive skills covers two of the three factors cited by the Supreme Court in *Atkins* and this court in *Grell I* as useful in determining the existence of mental retardation:  low IQ, poor adaptive skills, and onset before age eighteen. The criteria are based on the Diagnostic Criteria for Mental Retardation, Diagnostic & Statistical Manual of Mental Disorders (4th ed. 1994) ("DSM-IV") and are substantially consistent with the statutory definition in A.R.S. § 13-703.02(K)(2) (2002), which was enacted after Grell's sentencing.

¶13     Finding no mitigation sufficiently substantial to call for leniency, the judge sentenced Grell to death.

**B.   First Appeal**

¶14     An automatic notice of appeal was filed. While the parties prepared for oral arguments, the United States Supreme Court handed down opinions in *Atkins*, 536 U.S. at 304, and *Ring II*, 536 U.S. at 584. This case was consolidated with other capital cases pending on direct appeal at the time for the purpose of deciding common *Ring* issues. *State v. Ring* (*Ring III*), 204 Ariz. 534, 65 P.3d 915 (2003). This court issued a decision in *Grell I* without considering the sentencing issues. 205 Ariz. at 60, ¶ 25, 66 P.3d at 1237.

¶15     In *Grell I*, 205 Ariz. at 58, ¶ 2, 66 P.3d at 1235, this court addressed Grell's trial issue and affirmed his conviction, but remanded the matter to the trial court for a re-evaluation of Grell's mental retardation claim in light of *Atkins*. The trial court had evaluated the mental retardation evidence as a mitigating factor rather than as a complete bar to execution. This court suggested that, on remand, the trial judge should apply A.R.S. § 13-703.02 as a guide in future proceedings to ascertain the existence of mental retardation.[5]

---

[5]     Section 13-703.02, enacted before *Atkins* issued but after Grell's sentencing, defines the pretrial process for evaluating mental retardation in capital cases. First, the trial judge

- 8 -

*Id.* at 64, ¶ 42, 66 P.3d at 1241.

## C.   Remand for Mental Retardation Hearing

**¶16**      Attempting to follow the procedures in A.R.S. § 13-703.02, the trial judge first suggested appointing a "pre-screening expert" to test Grell's IQ.   Rather than subjecting Grell to additional testing, the State and the defense stipulated that Grell's IQ was less than 70 and that further IQ testing was unnecessary.

**¶17**      Before the mental retardation hearing, the parties briefed and argued the issue of burden of proof.   The statute places the burden on the defendant to prove mental retardation by clear and convincing evidence.   A.R.S. § 13-703.02(G).   Grell argued, however, that because mental retardation serves as a constitutional bar to execution, the standard should be no

---

appoints a pre-screening expert to administer an IQ test to the defendant.   A.R.S. § 13-703.02(B).   If the resulting score is 75 or below, the judge picks one expert nominated by each party, or one jointly nominated expert, to test the defendant again. A.R.S. § 13-703.02(D).   If any test result is 70 or below, the court conducts a hearing at which the defendant must prove by clear and convincing evidence that he has "significantly subaverage general intellectual functioning [an IQ of 70 or lower], existing concurrently with significant impairment in adaptive behavior, where the onset of the foregoing conditions occurred before the defendant reached the age of eighteen." A.R.S. § 13-703.02(G), (K).   If the court finds that the defendant's IQ is 65 or below, a rebuttable presumption of mental retardation arises.   A.R.S. § 13-703.02(G).   If the court does not find mental retardation, the defense may still argue the issue to the jury as a mitigating factor.   A.R.S. § 13-703.02(H).

higher than a preponderance of the evidence. Rejecting Grell's claim, the trial court required Grell to prove mental retardation by clear and convincing evidence.

¶18 During preparations for the hearing on remand, a new defense expert, Dr. Denis W. Keyes, interviewed Grell. The State requested that Grell also submit to examination by its new expert, Dr. Dan Martel. Before Dr. Keyes completed his report and before meeting with Dr. Martel, Grell told his attorneys he was "not willing to cooperate any further with any of our experts or investigators." Shortly thereafter, Dr. Keyes completed his report, which concludes that Grell has mental retardation.

¶19 After receiving Grell's written refusal to be examined, the State moved to "Preclude Defendant's Additional Mental Health Professional." The defense, which did not yet have Dr. Keyes' report, did not respond to the motion. As a result of these circumstances, the trial court granted the State's motion to preclude Dr. Keyes from testifying. After receiving Dr. Keyes' report, the defense filed a Motion to Reconsider, which was denied.

¶20 Following the motion and Grell's refusal to cooperate, each side determined that it had no additional evidence to present and would rely on the evidence presented at the June

2001 hearing.  The court held oral argument on December 7, 2004, at which each side argued from the same documents and the same testimony to the same judge as in the first hearing.  Quoting extensively from the record and noting that it had previously found the State's experts more persuasive, the trial court found nothing "to change its mind" and concluded that Grell had failed to satisfy his burden of proving mental retardation by clear and convincing evidence.

## II.  DISCUSSION

### A.  The Burden of Proof and Standard for Proving Mental Retardation

¶21      Grell's major argument on this appeal is that the trial court used a flawed process in finding that he does not have mental retardation.  He raises three challenges to the process:  First, the State should bear the burden of proving lack of retardation to a jury beyond a reasonable doubt.  Second, if the defendant must bear the burden of proof, the standard should be no higher than a preponderance of the evidence; the statutory requirement of clear and convincing evidence is unconstitutionally high.  Third, the process should be bifurcated, with both a pretrial hearing before a judge to determine, under *Atkins*, whether mental retardation should bar the defendant's execution and, should the judge not find mental retardation, a jury component in which the jury must find,

beyond a reasonable doubt, that the defendant does not have mental retardation.[6]

¶22   Grell's challenges raise issues of constitutional law and statutory construction, which we review de novo. *State v. Moody*, 208 Ariz. 424, 445, ¶ 62, 94 P.3d 1119, 1140 (2004). In analyzing statutes, however, we begin by assuming the statute is constitutional. *State v. Casey*, 205 Ariz. 359, 362, ¶ 11, 71 P.3d 351, 354 (2003).

1.   Imposing burden on defendant to prove mental retardation

¶23   For the hearing to determine whether Grell has mental retardation, this court instructed the trial court to apply the procedures in A.R.S. § 13-703.02 "insofar as is practical in the post-trial posture of this case." *Grell I*, 205 Ariz. at 64, ¶ 42, 66 P.3d at 1241. The statute places on "the defendant . . . the burden of proving mental retardation by clear and convincing evidence" in the pretrial hearing. A.R.S. § 13-703.02(G). If the defendant's IQ is 65 or lower, a rebuttable presumption of mental retardation arises. *Id.* Because the parties here stipulated that Grell's IQ falls between 65 and 70, the trial court accordingly placed the burden

---

[6]   The statute currently provides for a bifurcated process, *see supra* note 5, but the jury hears the mental retardation evidence only as a mitigating factor. *See* A.R.S. § 13-703.02(H).

- 12 -

on him to prove by clear and convincing evidence that mental retardation renders him ineligible for execution.  Grell argues that if the defendant must bear the burden at all, the standard should be to prove retardation by no more than a preponderance of the evidence.

¶24      This issue reaches our court because in *Atkins*, the Supreme Court declined to specify the procedures that states should use to identify mentally retarded individuals, deferring to the states to develop appropriate procedures.  *Atkins*, 536 U.S. at 317.  The Court did so in part in acknowledgement of the lack of consensus regarding which defendants have mental retardation:

> To the extent there is serious disagreement about the execution of mentally retarded offenders, it is in determining which offenders are in fact retarded. . . .  Not all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus.  As was our approach in *Ford v. Wainwright*, 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986), with regard to insanity, "we leave to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences."  *Id*. at 405, 416-417, 106 S.Ct. 2595.

*Atkins*, 536 U.S. at 317.  Although left to the states, the procedures developed must comport with the Constitution.

¶25      The Supreme Court has confirmed that states may "'regulate the procedures under which [their] laws are carried

out, including the burden of producing evidence and the burden of persuasion,' and [their] decision[s] in this regard [are] not subject to proscription under the Due Process Clause unless '[they] offend[] some principle of justice so rooted in the traditions and conscience of our people as to be ranked fundamental.'" *Patterson v. New York*, 432 U.S. 197, 201-02 (1977) (quoting *Speiser v. Randall*, 353 U.S. 513, 523 (1958)); *see also Medina v. California*, 505 U.S. 437, 445 (1992) (calling *Patterson* the "proper analytical approach" in evaluating burdens of proof).  Grell claims that imposing the burden on a defendant to prove mental retardation by clear and convincing evidence does offend deeply rooted principles.

¶26     Grell initially argues that the burden on the issue of mental retardation should not fall on the defendant at all, but rather should be borne by the State.  We disagree that the Constitution requires the prosecution to bear this burden.  The Supreme Court has held that a state may require that the defendant prove affirmative defenses.  *E.g.*, *Patterson*, 432 U.S. at 206 (requiring the defendant to prove extreme emotional disturbance); *Martin v. Ohio*, 480 U.S. 228, 236 (1987) (requiring the defendant to prove self defense).  Proof of mental retardation is like proof of an affirmative defense in that it serves to relieve or mitigate a defendant's criminal

responsibility, and as with affirmative defenses, the evidence of retardation will lie largely within the possession and control of the defendant.

¶27    Because the defendant has superior access to the evidence to prove his mental condition, it is not inappropriate to place the burden on him to do so.  *See Medina*, 505 U.S. at 455 (O'Connor, J., concurring); *cf*. *Patterson*, 432 U.S. at 206 (to same effect).  A critical component of proof of mental retardation is onset before age eighteen.  The defendant has better information regarding his condition and superior access to friends and family who knew him before he turned eighteen. Moreover, a defendant has significant motivation to attempt to score poorly on an IQ test, a low score on which triggers a claim of mental retardation.  *See* A.R.S. § 13-703.02(B).  Such evidence lies within the defendant's control and may prove difficult for the state to rebut.

¶28    New Jersey is the only state, as of this writing, to place the burden of disproving mental retardation on the state. *State v. Jimenez*, 880 A.2d 468, 484 (N.J. Super. Ct. App. Div. 2005).  It did so because state law developed under the *Ring*/*Apprendi* line of cases treats certain statutory "capital triggers" like aggravating factors that the state must prove to a jury beyond a reasonable doubt.  *Id*. at 482-84 (discussing the

implications of *Ring II*, 536 U.S. at 584, and *Apprendi v. New Jersey*, 530 U.S. 466 (2000)). The court in *Jimenez* held that mental retardation was essentially such a "capital trigger," which under New Jersey law the state must prove beyond a reasonable doubt. 880 A.2d at 484. Because, however, the absence of mental retardation is neither an aggravating factor nor an element of the capital offense under Arizona law, the rationale supporting the result in *Jimenez* does not apply here.

¶29 We find no constitutional bar to imposing the burden of proving mental retardation on the defendant.

    2. <u>Imposition of the "clear and convincing evidence" standard</u>

¶30 Citing *Cooper v. Oklahoma*, 517 U.S. 348 (1996), Grell asserts the unconstitutionality of requiring him to prove mental retardation by clear and convincing evidence. In *Cooper*, the Court, having already declared that the defendant must bear the burden of proving competency to stand trial, *id.* at 355, held that the defendant may not be forced to prove his competency by clear and convincing evidence. *Id.* at 369. The Court evaluated the right not to be tried while incompetent and weighed the impact of its loss on the defendant to determine the appropriate standard of proof. *Id.* at 354, 364. The Court observed that the right not to be tried if incompetent is a fundamental "principle of justice [so] rooted in the traditions and

conscience of our people" that its violation "threatens . . . the basic fairness of the trial itself." *Id*. at 364.

¶31    Furthermore, the Court reasoned, the heightened standard of proof affected only those defendants who could prove they were incompetent, but could not do so by clear and convincing evidence. *Id.* at 366-67. The higher standard affected those defendants' only opportunity to contest competency, creating a grave risk of violating their right not to be tried while incompetent. *Id.* The Court concluded that the defendants' interest outweighed the government's lesser interest in trying a probably incompetent defendant. *Id*. The Court also noted that forty-six other state jurisdictions used a lower standard of proof, showing consensus that Oklahoma's higher standard was unnecessary to serve the state's needs and inappropriate in light of the importance of the right. *Id*. at 361-62. The Court therefore held that due process limits the burden on the defendant to prove competency to stand trial by a standard no higher than preponderance of the evidence. *Id.* at 368-69.

¶32    As was the Court in *Cooper*, we have been asked to assess the statutory imposition of a clear and convincing evidence standard in a situation in which a preponderance standard would be permissible. Although the right not to be

executed if mentally retarded is of recent vintage, it — like the right not to stand trial if incompetent — is a constitutional right based on modern consensus and historical views regarding the propriety of executing those who may be "less morally culpable" because of their reduced mental capacity. *See Atkins*, 536 U.S. at 320-21. We also note that, following *Atkins*, all but one jurisdiction that has chosen a burden has chosen preponderance of the evidence.[7] We might have done so as well, were there no Arizona statute already in place. The question before us, however, is whether the standard chosen by the legislature to protect admittedly important state interests can withstand constitutional scrutiny.

---

[7] The following statutes, passed in 2003 after *Atkins*, impose a preponderance standard: Cal. Penal Code § 1369 (West, Westlaw through 2006 Sess.); Idaho Code Ann. § 19-2515A (Westlaw through 2005 Sess.); 725 Ill. Comp. Stat. Ann. 5/114-15 (West, Westlaw through 2005 Sess.); Nev. Rev. Stat. Ann. § 174.098 (West, Westlaw through 2005 Sess.); Utah Code Ann. § 77-15a-104 (West, Westlaw through 2005 2d Sess.); Va. Code Ann. § 19.2-264.3:1.1 (West, Westlaw through 2005 Sess.). The following cases, from jurisdictions in which no statute sets a burden, set preponderance as the appropriate standard: *State v. Williams*, 831 So. 2d 835, 860 (La. 2002); *Russell v. State*, 849 So. 2d 95, 148 (Miss. 2003); *State v. Lott*, 779 N.E.2d 1011, 1015 (Ohio 2002); *Commonwealth v. Mitchell*, 839 A.2d 202, 211 n.8 (Pa. 2003); *Franklin v. Maynard*, 588 S.E.2d 604, 606 (S.C. 2003); *Ex parte Briseno*, 135 S.W.3d 1, 12 (Tex. Crim. App. 2004).

Delaware, which passed its statute within a month of *Atkins*, is the lone exception. Del. Code Ann. Tit. 11, § 4209 (West, Westlaw through 2005 Sess.) (imposing a clear and convincing burden). Of the eighteen states that had statutes in place before *Atkins*, thirteen states use the preponderance standard. *See Atkins*, 536 U.S. at 314-15 & nn.12-15.

¶33 The statutory scheme enacted by the Arizona legislature does not merely prohibit execution of the mentally retarded. It provides a detailed, bifurcated process that requires a pretrial hearing at which a defendant may attempt to show, by clear and convincing evidence, that he has mental retardation; if he fails to make that showing, the defendant may still present mental retardation evidence to the jury in mitigation of his sentence. A.R.S. § 13-703.02. The statutory process gives the defendant with an IQ of 75 or below the opportunity to be examined by at least two psychological experts to determine his IQ. A.R.S. § 13-703.02(B), (D). Those with at least one full-scale IQ test result of 70 or below proceed for further evaluation and an evidentiary hearing. A.R.S. § 13-703.02(F), (G). Although the defendant bears the ultimate burden to prove mental retardation, the statute creates a rebuttable presumption of mental retardation if the defendant's IQ is 65 or below. A.R.S. § 13-703.02(G).[8]

¶34 The Arizona statute sets up a process similar to that

---

[8] By selecting an IQ of 65 as the number that gives rise to the presumption of retardation — which presumption assumes the existence of "significantly subaverage general intellectual functioning," concurrent "significant impairment in adaptive behavior," and onset before age eighteen, A.R.S. § 13-703.02(K)(2) — the legislature has given added protection to those defendants whom the DSM-IV would define as having "mild" mental retardation. DSM-IV 42-43.

used in Colorado and Indiana, and courts in both those states have evaluated the constitutionality of requiring a defendant to prove mental retardation by clear and convincing evidence.[9] *Compare People v. Vasquez*, 84 P.3d 1019 (Colo. 2004) (approving use of clear and convincing standard in a pretrial hearing), *with Pruitt v. State*, 834 N.E.2d 90 (Ind. 2005) (finding a clear and convincing standard unconstitutional). Grell and our dissenting colleague rely heavily on analysis from *Cooper* that also formed the basis of the *Pruitt* opinion. They argue that the definitive inquiry is the assessment of the relative risks faced by the parties: the defendant's risk of death compared to the state's minimal interest in executing a defendant who will otherwise go to prison for life.

---

[9] A Georgia statute requires the defendant to establish mental retardation by proof beyond a reasonable doubt, a burden that the Georgia Supreme Court has twice upheld. *See Head v. Hill*, 587 S.E.2d 613, 621 (Ga. 2003) (post-*Atkins* case analyzing Georgia Code Annotated § 17-7-131 (West, Westlaw through 2005 Special Sess.)); *Mosher v. State*, 491 S.E.2d 348 (Ga. 1997) (pre-*Atkins* case). Because the procedure under the Georgia statute differs substantially from that under the Arizona statute, however, we do not rely on the analysis in *Head* and *Mosher*. In those cases, the Georgia Supreme Court found the twin requirements that the defendant need only demonstrate incompetence to stand trial by a preponderance of the evidence and may prove mental retardation to a jury by proof beyond a reasonable doubt sufficient to safeguard mentally retarded persons against the special risks of trial to which they are subject. *Head*, 587 S.E.2d at 622. Arizona's safeguards are, if anything, more protective of the rights of the defendant than are Georgia's.

¶35    With respect to statutes like those in Arizona, Indiana, and Colorado, however, Grell overstates his case. As the Colorado Supreme Court stressed in *Vasquez*, the defendant's risk at a pretrial hearing is not death, but a capital trial.[10] 84 P.3d at 1023. By creating a pretrial process, the legislature provided a way for mentally retarded defendants to avoid the burden of a capital trial and the risk of imposition of the capital penalty. All defendants who do not prove mental retardation at the pretrial hearing retain the ability to present mental retardation evidence to the jury under a preponderance standard in the penalty phase of the trial. That opportunity reduces the ultimate risk they face from an adverse determination in the pretrial mental retardation hearing.

¶36    The court in *Pruitt* acknowledged but rejected the argument that the defendant's ability to argue mental retardation evidence in mitigation to the jury under a preponderance of the evidence standard adequately safeguards the defendant's rights. It reasoned that "[m]entally retarded defendants in the aggregate face a special risk of wrongful execution." 834 N.E.2d at 103 (quoting *Atkins*, 536 U.S. at

---

[10]   Grell's risk at this post-trial proceeding was of course different, but the outcome is functionally the same because he retains the right to present the evidence of mental retardation to the jury in mitigation. *See infra* ¶¶ 64-67.

321). Although the acknowledged risk that the *Pruitt* court identifies may justify barring the execution of the mentally retarded, it does not suggest the need for any particular procedure to ascertain mental retardation. Under Arizona's statutory procedure, these defendants about whom there is consensus against execution will be screened out at the pretrial stage. Given that fact, we cannot say that those unable to establish retardation by clear and convincing evidence face such a severe risk at sentencing that they may not constitutionally be put through the capital trial process.

¶37 Although the Court in *Atkins* clearly announced that states may not execute the mentally retarded, it recognized that people may disagree over which individuals in fact have mental retardation. 536 U.S. at 317. Before *Atkins*, states had already begun to develop their own procedures, and had drawn in different places the line for establishing the mental retardation that would bar execution. Knowing this, the Court explicitly left the procedure for determining mental retardation to the states. *Id*. State procedures must ensure that those about whom there is national consensus are protected from execution, but left states otherwise free to craft their laws for determining which defendants meet the consensus standard. By providing differing procedures based on the defendant's IQ,

Arizona law reflects this concept.  Those with IQ scores of 65 or below face a comparatively lower bar, while those whose IQ scores suggest greater intelligence must go to greater lengths to prove their mental retardation.  The legislature placed a heavier burden on those who do not fall within the group about whom there is national consensus regarding their right not to be executed.  The procedure occurs early in the capital process and removes defendants found to have mental retardation from exposure to a capital trial and hence to a sentence of death. *See* A.R.S. § 13-703.02(C), (F), (G).  The application of Arizona's tiered procedure does not deprive Grell of a right rooted in fundamental justice.

¶38     Finally, in response to the reliance of the defendant and our dissenting colleague on the analysis in *Cooper*, 517 U.S. at 348, we note the significant differences between the right not to be tried while incompetent and the right not to be executed if mentally retarded.  First, a defendant found incompetent to stand trial is protected from having to submit to trial on any charges unless he is restored to competency.  *See id*.  A defendant deemed to have mental retardation, however, is not shielded from trial.  *See Atkins*, 536 U.S. at 318.  Despite the risks that a mentally retarded defendant might not present well to a jury, such a defendant can be tried, found guilty, and

sentenced to any statutory criminal penalty other than death. This legal distinction suggests that mental retardation differs constitutionally from incompetence to stand trial.

¶39 The second distinction relates to the risk of malingering. A defendant who successfully feigns incompetence to stand trial will not have to submit to trial at that time. Generally, however, such a defendant is sent to a mental health facility for treatment and further examination of his competency. *See* Ariz. R. Crim. P. 11.5(b)(2)(i). Most often, the defendant is either restored to competency or discovered to be malingering. In the event of either occurrence, the defendant is subject to trial and punishment, including the death penalty, if appropriate. On the other hand, once a court determines that a defendant has mental retardation, that defendant may never suffer the punishment of execution, even if he is later discovered to have been malingering. These concerns support the heightened standard that the legislature has imposed to protect the interests of Arizona citizens.

¶40 A better comparison lies between claims of mental retardation as a bar to execution and claims of mental incompetence as a bar to execution. The defendant asserting the latter claim is also subject to a clear and convincing evidence burden of proof. *See* A.R.S. § 13-4022(F) (clear and convincing

burden of proof); *Ford v. Wainwright*, 477 U.S. 399, 410 (1986) (holding that the Eighth Amendment prohibits states from "inflicting the penalty of death upon a prisoner who is insane").  We are aware of no case finding it violative of the Constitution to require a defendant to prove incompetence to be executed by clear and convincing evidence.

**¶41**       In sum, we conclude that requiring the defendant to prove mental retardation by clear and convincing evidence in the initial retardation hearing does not violate constitutional standards.

### 3.    Jury determination of mental retardation

**¶42**       Grell argues that, under *Ring*, the jury must find beyond a reasonable doubt that the defendant does not have mental retardation before it may impose a sentence of death. Furthermore, he argues, the process should be bifurcated:  a judge should make a preliminary finding on mental retardation, and if the judge finds the defendant death-eligible, the state still must prove a defendant's lack of mental retardation beyond a reasonable doubt to the jury.

**¶43**       *Ring* and *Apprendi* require that a jury find all functional elements of a crime and all non-admitted facts except prior convictions that increase the sentence above the presumptive sentence.  *See Apprendi*, 530 U.S. at 489.  Although

mental retardation does indeed involve fact-finding, it is not the functional equivalent of an element of the crime. It has nothing to do with the acts that make up the crime itself or the defendant's mental state while committing the crime, facts the state traditionally must prove. As a result, *Ring* does not require that a jury find the absence of mental retardation. *See Arbelaez v. State*, 898 So. 2d 25, 43 (Fla. 2005); *Ex parte Briseno*, 135 S.W.3d 1, 10 (Tex. Crim. App. 2004); *Winston v. Commonwealth*, 604 S.E.2d 21, 50 (Va. 2004).

¶**44**     Nor is the absence of retardation a fact that *increases* the available penalty. *See Apprendi*, 530 U.S. at 490 n.16; *see also United States v. Booker*, 543 U.S. 220, 244 (2005). The finding that a defendant does not have mental retardation "neither expos[es] the defendant to a deprivation of liberty greater than that authorized by the verdict according to statute, nor . . . impos[es] upon the defendant a greater stigma than that accompanying the jury verdict alone." *Bowling v. Commonwealth*, 163 S.W.3d 361, 379 (Ky. 2005); *see also Head v. Hill*, 587 S.E.2d 613, 619-20 (Ga. 2003); *Russell v. State*, 849 So. 2d 95, 147-48 (Miss. 2003); *State v. Flores*, 93 P.3d 1264, 1267 (N.M. 2004); *State v. Laney*, 627 S.E.2d 726, 731 (S.C. 2006); *Howell v. State*, 151 S.W.3d 450, 467 (Tenn. 2004). Thus nothing in the *Apprendi* line of cases requires that a jury find

the absence of mental retardation beyond a reasonable doubt.

¶45     The Supreme Court itself has signaled that a jury need not decide the issue of mental retardation.  When the Ninth Circuit suspended federal habeas proceedings in *Schriro v. Smith* and ordered a state jury trial on the issue of mental retardation, the Supreme Court summarily reversed the decision, implicitly rejecting the conclusion that *Atkins* requires a jury trial.  126 S. Ct. 7, 9 (2005) (per curiam).  The defendant in *Schriro* had argued that he suffered from mental retardation and could not be executed.  *Id.* at 8.  Observing that Arizona and many states had adopted procedures for adjudicating the mental retardation question, the Court said, "While those measures might, in their application, be subject to constitutional challenge, Arizona had not even had a chance to apply its chosen procedures when the Ninth Circuit preemptively imposed its jury trial condition."  *Id.* at 9.  Although we hesitate to read too much into the summary reversal, we draw from it a suggestion that a jury trial is not required.

¶46     Grell also compares the mental retardation finding to *Enmund/Tison* findings, arguing that both are findings of fact that should be made by the jury beyond a reasonable doubt.  *See Tison v. Arizona*, 481 U.S. 137 (1987); *Enmund v. Florida*, 458 U.S. 782 (1982).  The analysis fails for two reasons.  First,

the Supreme Court has held that *Enmund/Tison* findings, that a defendant actually killed or intended to kill, need not be made by a jury. *See Cabana v. Bullock*, 474 U.S. 376, 385-86 (1986), *abrogated on other grounds by Pope v. Illinois*, 481 U.S. 497, 503 n.7 (1987). The Court's reasoning — that *Enmund/Tison* findings serve to disqualify an otherwise seemingly death-eligible defendant from death — suggests that that part of the opinion will survive *Apprendi*, because the findings mitigate rather than aggravate a potential sentence. *Id.; see also Ring III*, 204 Ariz. at 564, ¶ 100, 65 P.3d at 945 (concluding that *Cabana* survives *Apprendi* because it involves an Eighth Amendment proportionality analysis, traditionally done by a trial judge). Similarly, mental retardation serves to exclude a defendant from eligibility for the death penalty; its absence does not render an otherwise ineligible defendant eligible for the death penalty.

¶47    Second, *Enmund/Tison* findings lend themselves more logically to proof beyond a reasonable doubt than does proof of mental retardation. *Enmund/Tison* findings are based on evidence of participation in the crime and intent. Mental retardation, on the other hand, requires evaluation of the defendant's past and present mental functioning, using documentation and evidence largely within the control of the defendant. Placing the burden

- 28 -

on the prosecution to prove lack of retardation beyond a reasonable doubt would require it to prove a negative against a party with a motive to misrepresent his mental health and his past. The burden on the prosecution would be almost impossibly high.

¶48 Grell argues not only that the jury should hear the mental retardation evidence in mitigation, but also that it should decide whether mental retardation should serve as a bar to execution following an initial determination by the trial judge on that issue. Because *Atkins* left the procedure for determining mental retardation to the states, such a procedure would not be prohibited; but neither is it required. Indeed, the statute already requires that both the judge and jury evaluate mental retardation before a sentence of death may be imposed. The judge hears mental retardation evidence as a legal bar to execution and the jury hears it for mitigation purposes.

¶49 Grell acknowledges that having the jury serve as the *only* arbiter of mental retardation is not wise. The difficulties a mentally retarded person may have in testifying, communicating, and expressing remorse may negatively influence the jury. That factor formed an explicit basis of the Supreme Court's prohibition on execution of the mentally retarded. *See Atkins*, 536 U.S. at 320-21. But because the statute requires an

initial judicial determination, Grell's concern is ameliorated. The trial court did not err in determining that a jury need not determine mental retardation as a bar to execution.

**B.    Preclusion of Testimony from Defense Expert Dr. Keyes**

¶50      Defense counsel protests the exclusion of his third mental health expert as an unnecessarily harsh penalty for Grell's refusal to cooperate with the State's third mental health expert.  "Whether to preclude . . . a witness's testimony lies within the discretion of the trial court."  *Moody*, 208 Ariz. at 457, ¶ 135, 94 P.3d at 1152.  We will not reverse a sanction unless the trial court has abused its discretion.  *Id.*

¶51      The State moved to preclude Dr. Keyes from testifying about Grell's adaptive abilities after Grell refused to cooperate with the State's new mental health expert.  Relying on *State v. Druke*, 143 Ariz. 314, 693 P.2d 969 (App. 1984), and *State v. Schackart*, 175 Ariz. 494, 858 P.2d 639 (1993), the trial court granted the State's unopposed motion.  Concluding that it would be unfair to the State to allow the new defense expert when the State's new expert could not examine Grell, the court also denied the defense Motion to Reconsider, filed after Dr. Keyes filed a report concluding that Grell has mental retardation.

¶52      Defense counsel argues that *Druke*, *Schackart*, and

- 30 -

cases relating to insanity experts should not control Grell's case because mental retardation differs from insanity or impulsive behavior. Mental retardation, by definition, must exist before age eighteen. Grell argues that his current mental condition is therefore of only limited relevance. The State's expert, Dr. Scialli, stated as much in his testimony. Grell also emphasizes the difference between requiring the State to face a defense expert with no expert of its own, and having it face three defense experts with two experts of its own. The latter situation, he argues, does not prejudice the State's case.

¶53    While it may be true that an expert could have evaluated Grell's adaptive skills without interviewing him, the controlling statute defines mental retardation as including current impairment in adaptive ability. *See* A.R.S. § 13-703.02(K). Assessments based on recent interviews of the defendant are thus persuasive. Accordingly, the trial judge has discretion to preclude mental health experts as a sanction for the defendant's refusal to cooperate with interviews and testing. *Phillips v. Araneta*, 208 Ariz. 280, 285, ¶ 15, 93 P.3d 480, 485 (2004). Although such a sanction weighs especially heavily in a capital case, faced with the State's reduced ability to rebut Dr. Keyes' assessment of Grell's current

functioning, the judge did not abuse her discretion by precluding Dr. Keyes' testimony.

**C.   Denial of Motion to Strike Testimony of Dr. Scialli**

¶54     The defense argues that Dr. Scialli is not a qualified expert under A.R.S. § 13-703.02, the pretrial screening statute the trial court was attempting to follow, and his testimony should therefore have been precluded.

¶55     Whether a statute applies in a particular situation is a question of law, which we review de novo. *Schoneberger v. Oelze*, 208 Ariz. 591, 594, ¶ 12, 96 P.3d 1078, 1081 (App. 2004). We review the decision to admit or exclude evidence for abuse of discretion. *State v. Aguilar*, 209 Ariz. 40, 49, ¶ 29, 97 P.3d 865, 874 (2004).

¶56     Section 13-703.02(K)(3) defines a "psychological expert" as "a psychologist licensed pursuant to title 32, chapter 19.1 with at least two years' experience in the testing, evaluation and diagnosis of mental retardation."[11]   Dr. Scialli is a psychiatrist, not a psychologist.  The record shows that he

---

[11]   Section 32-2071 requires a "doctoral degree" from an accredited program in any of several areas of psychology.  The program must include hundreds of hours of supervised training.  A.R.S. § 32-2071(D).  Among the required subjects of study are "interviewing and the administration[,] scoring and interpretation of psychological test batteries for the diagnosis of cognitive abilities and personality functioning." A.R.S. § 32-2071(A)(4)(g).  Psychiatrists have medical training and receive an M.D. rather than a Ph.D.

- 32 -

has had training in mental retardation for a child psychiatry fellowship, has been a consultant with several government agencies, has "evaluated and consulted on" children with mental retardation for Child Protective Services, and has been the acting medical director for the Division of Developmental Disabilities, the agency responsible for the care of mentally retarded children and adults.

¶57        This court in *Grell I* acknowledged that A.R.S. § 13-703.02 should be applied to the hearing on remand only "insofar as is practical." The trial court reasonably concluded that it was not practicable to apply the statute on this issue. The State hired Dr. Scialli before it could possibly have known the yet-unpassed statute's requirements for qualifications of experts. In addition, Dr. Scialli appears to be qualified to diagnose and discuss retardation issues. Indeed, the defense relies on his testimony to support its own points about the diagnosis of retardation. And precluding Dr. Scialli's testimony would have left the State without an expert on mental retardation. His qualifications in this instance bear on the weight of his testimony, not its admissibility. The court did not abuse its discretion by allowing Dr. Scialli to testify.

**D.   Error in Finding that Grell Did Not Prove Mental Retardation**

¶58        The defense asserts that the trial court erred in

concluding that Grell does not have mental retardation and requests that we review that ruling. The decision was based largely on expert testimony; the trial court determined that the State's expert was more credible. "The trial judge has broad discretion in determining the weight and credibility given to mental health evidence." *State v. Doerr*, 193 Ariz. 56, 69, ¶ 64, 969 P.2d 1168, 1181 (1998). "We defer to the trial court's factual findings that are supported by the record and not clearly erroneous." *State v. Rosengren*, 199 Ariz. 112, 116, ¶ 9, 14 P.3d 303, 307 (App. 2000).

¶**59** Because the parties stipulated that Grell had a low IQ before age eighteen, the only issue in the hearing on remand was his adaptive functioning. Under Arizona law, the adaptive functioning component of a mental retardation diagnosis requires "significant impairment" in "the effectiveness or degree to which the defendant meets the standards of personal independence and social responsibility expected of the defendant's age and cultural group." A.R.S. § 13-703.02(K)(1), (K)(2).

¶**60** Defense counsel relied primarily on school and juvenile detention records to highlight examples of poor academic and social behavior. He argued that school and detention workers did not diagnose students based on the DSM-

IV,[12] and thus the fact that no one had diagnosed Grell as having mental retardation did not establish the absence of that condition. He urged the court to find deficits in the areas listed in the DSM-IV.

¶61 The State countered with three main themes: no doctor before defense expert Dr. Globus had ever diagnosed Grell as having mental retardation; behaving badly does not necessarily indicate adaptive deficits; and Grell can behave himself when he wants to do so. The State relied on the Vineland Scale as the only test administered to Grell as a youth that would reveal retardation. The score on that scale was low-average, assessing his intelligence as being only a year younger than his chronological age at the time. After moving to Arizona, five psychiatric reports all showed Grell to have a personality or conduct disorder, but none indicated mental retardation. Several school documents literally say that Grell demonstrated "good adaptive skills." The State also highlighted a ruse Grell concocted about his life following an arrest for robbery in 1996. Although he was twenty at the time, Grell claimed to be a juvenile named Michael Prentice and described a background

---

[12] The DSM-IV instructs that poor adaptive skills exist when there are deficits in at least two of the following areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety.

different from his own in a number of respects. Grell maintained the ruse for more than six months through repeated contacts with the justice system.

¶62     The defense claims to have clearly shown that Grell has deficits in two of the eleven areas listed in the DSM-IV and therefore has mental retardation. The DSM-IV definition of mental retardation, however, while similar in overall meaning, is not the same as the statutory definition. *See* A.R.S. § 13-703.02(K). The statute requires an overall assessment of the defendant's ability to meet society's expectations of him. It does not require a finding of mental retardation based solely on proof of specific deficits or deficits in only two areas.

¶63     Reasonable minds may differ as to how to interpret the evidence presented. The evidence does, however, support a finding that Grell was able to function at a level higher than that of "significant impairment." The trial judge's conclusion was reasonably supported by evidence. The trial court did not clearly err in finding that Grell failed to prove mental retardation by clear and convincing evidence.

E.    Entitlement to Jury Sentencing

¶64     Grell argues that he is entitled to jury sentencing by the terms of his trial-by-submission agreement. He asserts that he "agreed to a trial by submission in exchange for preserving

his claim that the United States Constitution entitled him to a jury determination of aggravation or mitigation at the sentencing phase." The cover statement of the stipulation states: "This stipulation shall in no way constitute a waiver of any rights the defendant may have to have a jury empanelled to determine the existence or absence of any aggravating and or mitigating circumstances."

¶65 The State acknowledges that Grell attempted to preserve his right to a jury trial for sentencing. It argues, however, that Grell preserved only any "right [he] may have" to a jury sentencing, not an absolute right to such a proceeding. Under *Ring*, the State thus maintains, Grell has a right to a jury sentencing only if the judicial sentencing was not harmless error.

¶66 While that may be one way to interpret the jury sentencing provision, Grell clearly believed that the stipulation would entitle him to a jury trial on aggravating facts if the *Ring* challenge was successful. When the parties signed the agreement in September 2000, *Apprendi* had just been decided. Its reasoning suggested that Arizona's judge-sentencing system was unconstitutional. Grell's stipulation was thus not a meaningless reservation of a pipe-dream right. Moreover, because Grell admitted the act of killing his

daughter, the sentencing hearing held increased significance as his only chance to avoid a sentence of death. He waived his right to a jury trial on the guilt-phase issues at least in part based on assurances that he would retain his right to be sentenced by a jury.

¶67 We find that the agreement entitles Grell to a jury sentencing. We therefore vacate the sentence of death and remand for a sentencing proceeding in accordance with A.R.S. §§ 13-703 and 13-703.01 (Supp. 2002).

## F. Other Issues

¶68 Grell raised several other issues, all of which are rendered moot by the remand for resentencing. We therefore decline to address them.

## III. CONCLUSION

¶69 We affirm the trial court's determination that Grell does not have mental retardation. Because we conclude that the State is bound by its agreement to afford a jury trial on sentencing, we vacate Grell's death sentence and remand the case for resentencing in accordance with A.R.S. §§ 13-703 and 13-703.01.

_____
Rebecca White Berch, Vice Chief Justice

CONCURRING:


_____

Ruth V. McGregor, Chief Justice


_____

Michael D. Ryan, Justice


_____

Sheldon H. Weisberg, Judge*


*Pursuant to Article 6, Section 3 of the Arizona Constitution, the Honorable Sheldon H. Weisberg, Chief Judge of the Arizona Court of Appeals, Division One, was designated to sit in this matter.



**B A L E S**, Justice, concurring in part and dissenting in part

¶70    Based on the Supreme Court's decisions in *Atkins* and *Cooper*, I do not believe that the federal constitution allows states to execute defendants who are more likely than not mentally retarded but who cannot prove their retardation by the higher standard of clear and convincing evidence.  Accordingly, I respectfully dissent from my colleagues' decision to uphold the clear and convincing standard contained in A.R.S. § 13-703.02(G).

¶71    "[D]eath is not a suitable punishment for a mentally retarded criminal."  *Atkins*, 536 U.S. at 321.  Although *Atkins*

- 39 -

allows states to develop appropriate ways to enforce this constitutional restriction, *id.* at 317, the procedures adopted must themselves pass constitutional muster. *Cooper* outlines the proper framework for determining if a statutorily-assigned standard of proof on the issue of mental retardation comports with due process.

¶72     The majority recognizes that, while the right not to be executed if mentally retarded is of "recent vintage," both this right (*Atkins*) and the right not to stand trial if incompetent (*Cooper*) are "constitutional right[s] based on modern consensus and historical views" of the issues. Op. ¶ 32; *accord Pruitt v. State*, 834 N.E.2d 90, 100-03 (Ind. 2005) (noting that the Supreme Court has identified the right of mentally retarded defendants not to be executed as grounded in a fundamental principle of justice).  I agree with the majority that, just as states may place on defendants the burden of proving competency, states may place on defendants the burden of proving mental retardation.  Op. ¶ 29.

¶73     My disagreement with the majority concerns the standard, rather than the burden, of proof.  In arguing for a clear and convincing standard, the majority notes that there are "significant differences" between the right of the incompetent not to be tried and the right of the retarded not to be

executed.  *Id.* ¶ 38.  Noting differences in these constitutional rights does not itself justify requiring defendants to prove retardation by the higher standard of proof; nor does it substitute for actually applying the *Cooper* analysis.  Moreover, the difference between a defendant who might be executed if a court incorrectly rejects a claim of mental retardation and an incompetent defendant who might erroneously be subjected to a trial does not support imposing a higher standard on the former as compared to the latter.

¶74    Nor can the majority justify a higher standard of proof by comparing the rights of the retarded and the mentally insane.  *Id.* ¶ 40.  The standard of proof arguably should be higher for eve-of-execution claims of insanity by defendants who were competent to be tried and sentenced to death as compared to defendants who claim to be mentally retarded, a permanent condition which must be established by evidence of onset before age eighteen.  *Cf. Ford v. Wainwright*, 477 U.S. 399, 426 (1986) (Powell, J., concurring) (noting state may presume defendant remains sane and require defendant to make substantial threshold showing to obtain hearing on post-sentencing claim of insanity).  Moreover, since *Cooper*, neither the Supreme Court nor this court has addressed whether a state can, consistent with the constitution, execute a person who is more likely than not

insane. Thus, the fact that Arizona statutes require defendants to establish mental incompetence (i.e., insanity) by clear and convincing evidence as a bar to execution, *see* A.R.S. § 13-4022(F), does not resolve whether the higher standard can constitutionally apply to that issue or to the issue of mental retardation.[13]

¶75 Our legislature enacted A.R.S. § 13-703.02 before *Atkins* held that executing a mentally retarded defendant violates the Eighth Amendment's prohibition against cruel and unusual punishment, 536 U.S. at 316, 321. Thus, A.R.S. § 13-703.02 does not reflect a legislative effort to adopt a statute in light of the constitutional prohibition. Since *Atkins*, as the majority acknowledges, all but one of those states that have

---

[13] The majority notes that the Georgia Supreme Court has upheld a standard of proof beyond a reasonable doubt for defendants claiming to be mentally retarded. Op. ¶ 34 n.9. The Georgia statutory scheme, which allows a verdict of "guilty but mentally retarded" in felony cases, substantially differs from Arizona's capital sentencing scheme, as the majority acknowledges. *Id.* Moreover, the Georgia decisions are not persuasive on the issue presented here. In *Head v. Hill*, 587 S.E.2d 613, 621 (Ga. 2003), the court reasoned that if a defendant may be required to prove insanity beyond a reasonable doubt, *see Leland v. Oregon*, 343 U.S. 790 (1952), then requiring proof of mental retardation beyond a reasonable doubt is also constitutional. This reasoning, however, fails to recognize that, under *Atkins*, the mentally retarded have a constitutional right not to be executed. Whether the State may assign to the defendant a higher standard for proving non-constitutional defenses at trial does not address whether the State can execute defendants who prove they are more likely than not mentally retarded.

set the standard of proof for proving mental retardation have adopted a preponderance standard. Op. ¶ 32.

**¶76** The majority, however, discounts the significance of the standard of proof by arguing that, because Arizona's statutes provide for a pretrial determination of mental retardation, "the defendant's risk . . . is not death, but a capital trial." *Id.* ¶ 35. The majority further states that the ability of defendants to present mental retardation evidence as mitigation during the sentencing hearing reduces "the ultimate risk they face from an adverse determination" under the clear and convincing standard for the pretrial hearing. *Id.*

**¶77** The flaw in this analysis is that the pretrial hearing under A.R.S. § 13-703.02 is the defendant's *only* opportunity to secure his constitutional rights under *Atkins*. *See id.* ¶ 48 ("The judge hears mental retardation evidence as a legal bar to execution and the jury hears it for mitigation purposes."); *cf. id.* ¶ 31 (recognizing that the competency hearing provides "those defendants' only opportunity to contest competency"). Under our statutes, the jury does not decide the *Atkins* issue when it makes its sentencing determination. *See id.* ¶ 48. Instead, each juror makes his or her own decision whether the defendant has proven any mitigating facts and how such facts should be valued. A.R.S. § 13-703(C); *State ex rel. Thomas v.*

*Granville*, 211 Ariz. 468, ___ ¶ 12 n.3, 123 P.3d 662, 665 n.3 (2005).[14]

**¶78**      Mitigation does not go to the constitutional issue in *Atkins*.    Even before *Atkins*, a defendant could argue mental retardation as relevant mitigation evidence.    *Penry v. Lynaugh*, 492 U.S. 302, 319-20 (1989) (holding that, although the constitution did not prohibit execution of mentally retarded defendants, the defendant must be allowed to present mental retardation as mitigation evidence)*; see also* A.R.S. § 13-703(G).    *Atkins*, however, made clear that the ability to argue mitigation is not sufficient to avoid the constitutional issue as "[m]entally retarded defendants in the aggregate face a special risk of wrongful execution."    536 U.S. at 321 (abrogating *Penry*, 492 U.S. at 323-25).[15]

---

[14]    *Cf. Johnson v. State*, 102 S.W.3d 535, 541 (Mo. 2003) ("[T]he jury was not faced with the *Atkins* pronouncement: 'death is not a suitable punishment for a mentally retarded criminal.' Rather, the jury instructions treated mental retardation as a mere mitigating circumstance—not the outright bar to punishment dictated by *Atkins*."); Kristen F. Grunewald, Case Notes, Atkins v. Virginia, *122 S. Ct. 2242*, 15 Cap. Def. J. 117, 125 (2002) ("In *Atkins*, mental retardation acts as a bar to death.    In mitigation, mental retardation is a reason to show mercy.").

[15]    This court recognized the substantial difference between considering mental retardation as a possible mitigating factor and treating it as an absolute bar to the death penalty when the court remanded this case for reconsideration in light of *Atkins* after the trial judge had rejected Grell's claim of mental retardation as a mitigating factor.    *See State v. Grell*, 205 Ariz. 57, 63, ¶¶ 37-40, 66 P.3d 1234, 1240 (2003).

¶79　　　Although one or more jurors may find that the defendant has proven mental retardation by a preponderance of the evidence, the jurors remain free to decide that such evidence is not sufficiently substantial to call for leniency and to impose a death sentence.　*See* A.R.S. § 13-703(C); *Granville*, 211 Ariz. at ___ ¶ 12 n.3, 123 P.3d at 665 n.3. Indeed, as the Supreme Court noted in *Atkins*, reliance on mental retardation as a mitigating factor can be a "two-edged sword" because the jury may consider the same evidence as supporting the imposition of a death sentence.　536 U.S. at 321 (noting that mental retardation may enhance likelihood of finding of aggravating factor of future dangerousness). We cannot uphold a clear and convincing standard by relying on the very process the *Atkins* court determined was insufficient to protect the constitutional rights of the mentally retarded.

¶80　　　In addition, the majority reasons that a clear and convincing standard is constitutional because *Atkins* recognized that, while there is national consensus against executing the mentally retarded, "people may disagree over which individuals in fact have mental retardation."　Op. ¶ 37.　States must protect those defendants who fall within the national consensus on mental retardation, but "are otherwise free to craft their laws for determining which defendants meet the consensus

standard." *Id.* But the fact that the Court has afforded states some flexibility in substantively defining mental retardation in no way answers whether states may constitutionally execute those defendants who prove they are more likely than not retarded under any applicable definition.

¶81      The majority attempts to argue that A.R.S. § 13-703.02 protects those defendants who fall within the national consensus by providing them with "a comparatively lower bar" while requiring defendants with higher IQ scores to "go to greater lengths to prove their mental retardation." *Id.* This argument mistakenly assumes the "national consensus" embraces only defendants whose IQs are 65 or below and it fails to recognize how the statute actually works even as to those defendants. Although A.R.S. § 13-703.02 creates a rebuttable presumption of mental retardation for defendants whose IQ scores are 65 or below, this presumption shifts only the burden of production, not the burden of persuasion, to the State. *State v. Arellano*, ___ Ariz. ___, ___ ¶¶ 11-12, ___, P.3d ___, ___ (2006). Once the State has come forth with any evidence to rebut the presumption, the defendant still must prove mental retardation by clear and convincing evidence, regardless of IQ scores.

¶82      Additionally, the majority dismisses the "special risk of wrongful execution" faced by mentally retarded defendants by

stating "it does not suggest the need for any particular procedure to ascertain mental retardation." Op. ¶ 36. The majority asserts that the clear and convincing standard will assure that "defendants about whom there is a consensus against execution will be screened out at the pretrial stage"; other defendants do not "face such a severe risk at sentencing that they may not constitutionally be put through the capital trial process." *Id.*

¶83    The right of the mentally retarded not to be executed, however, is not limited to those defendants who are severely retarded or who otherwise can establish their condition by especially compelling evidence.[16]    Under *Atkins*, the Eighth Amendment prohibits the execution of *all* mentally retarded defendants.    *See id.* ¶ 37 ("[T]he Court in *Atkins* clearly announced that states may not execute the mentally retarded . . . .").    Defendants who can prove their mental retardation by only a preponderance will not be "screened out"; as a result, they still face the same special risk that, according to *Atkins*, cannot be remedied during mitigation.    536

---

[16]    Indeed, the defendant in *Atkins* claimed to be "mildly mentally retarded," 536 U.S. at 308, and our statute includes mildly mentally retarded defendants, A.R.S. § 13-703.02(K)(4). *See also Atkins,* 536 U.S. at 308 n.3 (noting that "mild" mental retardation is typically used to describe people with an IQ level of 50-55 to approximately 70) (citing Diagnostic and Statistical Manual of Mental Disorders 42-43 (4th ed. 2000)).

U.S. at 320-21.

¶84    Thus, the real issue here, which the majority does not directly confront, is whether the State can constitutionally execute those defendants who prove they are more likely than not mentally retarded but cannot meet the clear and convincing standard under A.R.S. § 13-703.02(G).

¶85    The Supreme Court in *Cooper* applied due process principles to assess a state's imposing a clear and convincing standard of proof on a criminal defendant.    Although *Cooper* dealt with the constitutional right not to stand trial if incompetent, its framework applies in evaluating the standard of proof on mental retardation.    *See Pruitt*, 834 N.E.2d at 100-03 (applying *Cooper* to mental retardation issue); *State v. Williams*, 831 So. 2d 835, 859-60 (La. 2002) (same); *Howell v. State*, 151 S.W.3d 450, 463-65 (Tenn. 2004) (same); *see also Bowling v. Commonwealth*, 163 S.W.3d 361, 382 (Ky. 2005) (citing *Cooper* and applying preponderance of the evidence standard as "[w]e have applied . . . to a defendant's burden to prove incompetency to stand trial").

¶86    In *Cooper*, the Court noted that historic and contemporary standards support a fundamental right not to stand trial if incompetent; in *Atkins*, the Court recognized a similar right not to be executed if mentally retarded.    Op. ¶ 32.    The

*Cooper* court also noted that most jurisdictions required a preponderance of the evidence or less to show incompetency; similarly, most jurisdictions require only a preponderance of the evidence for a showing of mental retardation. *Id.* & n.7.

¶87    Given the constitutional right at issue, the Court in *Cooper* weighed the respective interests of the state and the defendant to assess the fundamental fairness of requiring the defendant to prove incompetency by clear and convincing evidence. 517 U.S. at 362-67. "The function of a standard of proof . . . is to instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions . . . ." *Id.* at 362 (quotation marks and citation omitted). "The more stringent the burden of proof a party must bear, the more that party bears the risk of an erroneous decision." *Id.* (quotation marks and citation omitted).

¶88    The *Cooper* court determined that the "consequences of an erroneous determination of competence are dire" for the defendant because he would not be able to communicate with his attorney or exercise other fundamental rights involved in a fair trial. *Id.* at 364. In contrast, the injury to the state from an erroneous conclusion that a defendant is incompetent when he in fact is malingering is "modest." *Id.* at 365. The state may

incur expense and delay, but such errors are subject to correction in subsequent proceedings and the state may detain the defendant for a reasonable time to determine if he might later become competent. *Id.* Recognizing that there were important state interests at stake, the Court concluded that, where incompetence is shown by a preponderance of the evidence, "the defendant's fundamental right to be tried only while competent outweighs the [s]tate's interest in the efficient operation of its criminal justice system." *Id.* at 367.

¶89 Applying *Cooper*'s weighing of interests framework here, the use of a clear and convincing evidence standard "would significantly increase the risk of an erroneous determination" of no mental retardation for defendants who can prove they are more likely than not mentally retarded. *Williams*, 831 So. 2d at 860 (citing *Cooper*, 517 U.S. at 362-63). The imposition of the death penalty is serious and permanent; any mistake cannot be undone once the punishment is carried out. *See Evans v. State*, 886 A.2d 562, 584 (Md. 2005) ("Reflected throughout the Supreme Court jurisprudence underlying the Eighth Amendment is the principle that death is different.").

¶90 The State's interest, in contrast, is at best modest, likely even less than the interest involved in *Cooper. See Howell*, 151 S.W.3d at 465 ("[T]he risk to the petitioner of an

erroneous outcome is dire, as he would face the death penalty, while the risk to the State is comparatively modest.") (citing *Cooper*, 517 U.S. at 364-65). At oral argument, counsel for the State candidly acknowledged that the State does not have any "particular interest" in executing those defendants who can establish their mental retardation by a preponderance but not by clear and convincing evidence. To be sure, the State does have an interest in preventing malingering defendants from obtaining erroneous determinations of their mental retardation. But such determinations do not, in contrast to the competency determinations involved in *Cooper*, prevent the State from concluding criminal proceedings against the defendant; they instead limit the ultimate punishment the State can exact. Additionally, the risks of malingering are reduced because the statutory definition of mental retardation requires proof not only of a low IQ but also significantly impaired adaptive behavior and the onset of such conditions before the age of eighteen. A.R.S. § 13-703.02(K)(2).

¶91    When the relative risks are death and a lesser available punishment, "the defendant's right not to be executed if mentally retarded outweighs the state's interest as a matter of federal constitutional law." *Pruitt*, 834 N.E.2d at 103; *accord Williams*, 831 So. 2d at 860 ("Clearly, in the *Atkins*

context, the State may bear the consequences of an erroneous determination that the defendant is mentally retarded (life imprisonment at hard labor) far more readily than the defendant of an erroneous determination that he is not mentally retarded."); *Howell*, 151 S.W.3d at 465 ("The balance, under these circumstances, weighs in favor of the petitioner and justifies applying a preponderance of evidence standard at the hearing.").

¶92      In light of the interests involved, I would hold that the clear and convincing standard of proof under A.R.S. § 13-703.02(G) is unconstitutional because the State cannot, consistent with due process, execute those defendants who show they are more likely than not mentally retarded.  Thus, on remand, the trial court should consider whether Grell can establish mental retardation by a preponderance of the evidence before the court conducts further sentencing proceedings before a jury.  I otherwise concur in the majority's opinion.


_____
W. Scott Bales, Justice