IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

STATE OF ARIZONA EX REL. WILLIAM G. MONTGOMERY,
MARICOPA COUNTY ATTORNEY,
*Petitioner*,

*v.*

THE HONORABLE MICHAEL W. KEMP, JUDGE OF THE SUPERIOR COURT OF
THE STATE OF ARIZONA, IN AND FOR THE COUNTY OF MARICOPA,
*Respondent Judge*,

APOLINAR ALTAMIRANO,
*Real Party in Interest.*

No. CR-19-0274-PR
Filed August 17, 2020

Special Action from the Superior Court in Maricopa County
The Honorable Michael W. Kemp, Judge
No. CR2015-103569-001
**REVERSED AND REMANDED**

Decision Order of the Court of Appeals, Division One
No. 1 CA-SA 19-0162
Filed August 8, 2019
**VACATED**

COUNSEL:

Allister Adel, Maricopa County Attorney, Julie A. Done, Jeffrey L. Sparks
(argued), Amanda M. Parker, Kristin Larish, Deputy County Attorneys,
Phoenix, Attorneys for State of Arizona

Gregory J. Kuykendall (argued), Kuykendall & Associates, Tucson, *Knapp*
Counsel for Apolinar Altamirano

Emily Wolkowicz, Jamaar Williams, Deputy Public Defenders, Phoenix,
Attorneys for Apolinar Altamirano

Colleen Clase, Thomas E. Lordan, Arizona Voice for Crime Victims, Phoenix, Attorneys for Crime Victims

Mark Brnovich, Arizona Attorney General, Lacey Stover Gard, Chief Counsel, Laura P. Chiasson, Assistant Attorney General, Criminal Appeals Section, Tucson, Attorneys for Amicus Curiae The Arizona Attorney General

Emily Skinner, Arizona Capital Representation Project, Phoenix; David J. Euchner, Pima County Public Defender's Office, Tucson; and Charlotte G. Merrill, Federal Public Defender's Office, Phoenix, Attorneys for Amici Curiae Arizona Capital Representation Project and Arizona Attorneys for Criminal Justice

Rhonda Elaine Neff, Kimerer & Derrick, P.C., Phoenix, Attorney for Amicus Curiae American Association on Intellectual and Developmental Disabilities

JUSTICE BEENE authored the Opinion of the Court, in which VICE CHIEF JUSTICE TIMMER and JUSTICES BOLICK, GOULD, and LOPEZ joined.[*]

JUSTICE BEENE, Opinion of the Court:

¶1 In *Atkins v. Virginia*, 536 U.S. 304 (2002), the United States Supreme Court declared that a person with an intellectual disability cannot be sentenced to death. A finding of intellectual disability requires a mental deficit "existing concurrently with significant impairment in adaptive behavior" before the defendant is eighteen. A.R.S. § 13-753(K)(3). In this case, we discuss the impact of the recent United States Supreme Court cases, *Moore v. Texas*, 137 S. Ct. 1039 (2017) ("*Moore I*"), and *Moore v. Texas*, 139 S. Ct. 666 (2019) ("*Moore II*"), on § 13-753(K)(1)'s definition of "adaptive behavior." We hold that *Moore I* and *Moore II* did not eliminate § 13-753(K)(1)'s requirements that the trial court: (1) conduct an overall assessment, as set forth in *State v. Grell*, 212 Ariz. 516, 529 ¶ 62 (2006) ("*Grell*

---

[*] Chief Justice Robert Brutinel and Justice William G. Montgomery have recused themselves from this matter.

*II*"), to determine if the defendant has a deficit in any life-skill category;[1] and (2) if a deficit exists, determine whether it affects the defendant's ability to meet "the standards of personal independence and social responsibility expected of defendant's age and cultural group."

**BACKGROUND**

¶2        On January 22, 2015, Altamirano shot and killed a convenience store clerk while attempting to purchase a pack of cigarettes. After killing the clerk, Altamirano left the store and was later apprehended by police. The State indicted Altamirano for first degree murder and filed a Notice of Intent to Seek the Death Penalty.

¶3        The trial court ordered Altamirano to undergo an intelligence quotient ("IQ") prescreening evaluation pursuant to § 13-753(B). Altamirano initially objected to the evaluation. However, a few months before trial, Altamirano requested an IQ evaluation, and the trial court granted the request. Based on Altamirano's evaluation, the trial court held an evidentiary hearing to determine if he was intellectually disabled. *See* § 13-753(G). At the conclusion of the hearing, the court found that Altamirano met his burden of proving intellectual disability and dismissed the State's Notice of Intent to Seek the Death Penalty.

¶4        The State filed a special action with the court of appeals alleging the trial court erred by ignoring the statutory definition of intellectual disability, which requires an overall assessment of Altamirano's ability to meet society's expectations of him. The court of appeals issued a decision order accepting jurisdiction but denying relief, finding "the judge discussed both adaptive weaknesses *and* adaptive strengths in the conceptual, social, and practical domains." It further determined this was not "clear error because the respondent judge heard competent lay and expert testimony to support an intellectual disability finding."

---

[1]        The "life-skill" categories are the three adaptive behavior categories—conceptual, practical, and social—identified by the Diagnostic and Statistical Manual of Mental Disorders ("DSM-5") and the American Association on Intellectual and Developmental Disabilities ("AAIDD"). *See* American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 37 (5th ed. 2013) [hereinafter DSM-5]; AAIDD, User's Guide: Intellectual Disability: Definition, Classification, and Systems of Supports 1 (11th ed. 2012) [hereinafter AAIDD Guide].

**¶5**        We accepted review to determine whether Arizona's statutory framework for determining intellectual disability complies with recent Supreme Court opinions, which is a matter of statewide concern. We have jurisdiction pursuant to article 6, section 5(3) of the Arizona Constitution.

## DISCUSSION

**¶6**        In Arizona, "'[i]ntellectual disability' means a condition based on a mental deficit that involves significantly subaverage general intellectual functioning, existing concurrently with significant impairment in *adaptive behavior*, where the onset of the foregoing conditions occurred before the defendant reached the age of eighteen." § 13-753(K)(3) (emphasis added). The parties dispute whether the trial court properly applied § 13-753(K)(1), which defines "adaptive behavior," in light of the Supreme Court's recent decisions in *Moore I* and *Moore II*. We review matters of statutory interpretation and constitutional law de novo. *Grell II*, 212 Ariz. at 521 ¶ 22. We presume a statute is constitutional and, where possible, construe it to preserve its constitutionality. *State v. Thompson*, 204 Ariz. 471, 474 ¶ 10 (2003).

## I.        Intellectual Disability Developments

**¶7**        In *Atkins*, the Supreme Court addressed the constitutionality of imposing the death penalty on intellectually disabled individuals. 536 U.S. at 307. There, Atkins—who had been convicted of murder and sentenced to death—claimed he was intellectually disabled based on evidence that he was "mildly mentally retarded," as defined by the medical community, and that the imposition of the death penalty on an intellectually disabled person violated the Eighth Amendment. *Id.* at 307–10 & n.3, 318. The Supreme Court agreed, concluding that executing the intellectually disabled would not "advance the deterrent or the retributive purpose of the death penalty." *Id.* at 321. It concluded that imposing the death penalty on intellectually disabled defendants was an excessive punishment in violation of the Eighth Amendment. *Id.*

**¶8**        In barring enforcement of the death penalty against the intellectually disabled, the Supreme Court left "to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences" and determine who is "in fact" intellectually disabled. *Id.* at 317 (quoting *Ford v. Wainwright*, 477 U.S. 399, 405, 416–17 (1986)).

**¶9**        The Arizona legislature enacted A.R.S. § 13-703.02(K)[2] to enforce the constitutional prohibition on executing the intellectually disabled.   In *Grell II*, we stated that § 13-703.02(K) requires an "overall assessment of the defendant's ability to meet society's expectations of him. [But] [i]t does not require a finding of [intellectual disability] based solely on proof of specific deficits or deficits in only two areas."  212 Ariz. at 529 ¶ 62.

**¶10**        Twelve years after *Atkins*, the Supreme Court decided *Hall v. Florida*, 572 U.S. 701 (2014), and provided additional guidance in determining whether a defendant is intellectually disabled.  It concluded that Florida's law foreclosing further exploration of a defendant's intellectual disability if his IQ score was higher than 70 created an unacceptable risk that persons with intellectual disabilities would be executed.  *Id.* at 723–24.  The Supreme Court reversed the trial court's determination that Hall was not intellectually disabled.  *Id.* at 724.  It noted that pursuant to Florida's mandatory IQ cutoff, the sentencing court could not "consider even substantial and weighty evidence of intellectual disability as measured and made manifest by the defendant's failure or inability to adapt to his social and cultural environment," some of which would, in persons with severe adaptive behavior problems, reduce the person's actual functioning comparable to that of an individual with a lower IQ score.  *Id.* at 712.  The *Hall* Court clarified that "*Atkins* did not give the States unfettered discretion to define the full scope of the constitutional protection" and that "[t]he legal determination of intellectual disability is distinct from a medical diagnosis, but it is informed by the medical community's diagnostic framework."  *Id.* at 719, 721.

**¶11**        In *State v. Escalante-Orozco*, 241 Ariz. 254 (2017), we addressed *Hall*'s requirement that a legal determination of intellectual disability be informed by the medical community.  We clarified that § 13-753(K)(1), Arizona's intellectual disability statute, "differs from a clinical definition, which bases an impairment in adaptive functioning on deficits in at least two life-skill categories without considering strengths."  *Escalante-Orozco*, 241 Ariz. at 267 ¶ 16 (citing *State v. Boyston*, 231 Ariz. 539, 547 ¶ 34 (2013); *Grell II*, 212 Ariz. at 529 ¶ 62), *abrogated on other grounds by State v. Escalante*, 245 Ariz. 135 (2018). We also concluded that "Arizona's failure to precisely align its definition of adaptive behavior with the prevailing medical definition does not violate the Eighth Amendment" because "the required 'overall assessment' permits consideration of deficits in the life-skill categories identified by medical clinicians."   *Id.* at 268 ¶ 17 (citations

---

[2]        Renumbered as § 13-753 effective January 1, 2009.

omitted). Although Arizona's statute may differ from a clinical definition of adaptive behavior, the medical community also recognizes that adaptive behavior requires a consideration of "how well a person meets community standards of personal independence and social responsibility, in comparison to others of similar age and sociocultural background." DSM-5, *supra* ¶ 1 n.1, at 37; *see also* AAIDD Guide, *supra* ¶ 1 n.1, at 25 ("[L]imitations in . . . present functioning must be considered within the context of community environments typical of the individual's age peers and culture.").

**¶12** Recently, the Supreme Court decided *Moore I* and disapproved the Texas Court of Criminal Appeals' ("CCA") reliance on factors to determine intellectual disability that were not informed by the medical community. 137 S. Ct. at 1044 (vacating the CCA's determination that Moore was not intellectually disabled). Although the CCA relied on factors set forth in its prior case law in assessing Moore's claim of intellectual disability, the Supreme Court found that the CCA's reliance on these factors was not "informed by the views of medical experts." *Id.* (quoting *Hall*, 572 U.S. at 721). It determined that in departing from the views of the medical community, the CCA's intellectual disability analysis "creat[ed] an unacceptable risk that persons with intellectual disability [would] be executed." *Id.* (quoting *Hall*, 572 U.S. at 704). The Court further faulted the CCA for "overemphasiz[ing] Moore's perceived adaptive strengths" in certain life-skill categories (conceptual, social, and practical) when the "medical community focuses the adaptive-functioning inquiry on adaptive *deficits*." *Id.* at 1050.

**¶13** Subsequently, in *Moore II*, the Supreme Court reiterated that although "*Atkins* and *Hall* left to the states the task of developing appropriate ways to enforce the restriction on executing the intellectually disabled," a "court's intellectual disability determination must be informed by the medical community's diagnostic framework." 139 S. Ct. at 668–71 (internal citations omitted) (internal quotation marks omitted).

**¶14** We distill from *Moore I* and *Moore II* the principle that, although the states retain a measure of flexibility in enforcing the ban on executing the intellectually disabled, the legal determination of intellectual disability must be informed by the views of the medical community. With this understanding, we turn to the law in Arizona to determine whether its procedures for determining intellectual disability comport with existing federal law.

## II.    Section 13-753(K)

¶15          To prove "intellectual disability" in Arizona, a defendant must establish: 1) significantly subaverage intellectual functioning; 2) significant impairment in adaptive behavior; and 3) onset of these conditions before the defendant reached the age of eighteen. § 13-753(K)(3). Courts must determine a defendant's intellectual disability "using current community, nationally and culturally accepted physical, developmental, psychological and intelligence testing procedures, for the purpose of determining whether the defendant has an intellectual disability." § 13-753(E). Arizona law thus incorporates the Supreme Court's requirement that an intellectual disability determination be informed by the medical community's current standards.

¶16          Section 13-753(K)(1) defines "adaptive behavior" as "the effectiveness or degree to which the defendant meets the standards of personal independence and social responsibility expected of the defendant's age and cultural group." As we stated in *Grell II*, this definition is "similar in overall meaning" to the clinical definition. 212 Ariz. at 529 ¶ 62. The medical community has identified three life-skill categories—conceptual, social, and practical—and Arizona courts address these categories in determining if an individual has an impairment in adaptive behavior. *See* DSM-5, ¶ 1 n.1, at 37; AAIDD Guide, ¶ 1 n.1, at 1; *see also Escalante-Orozco*, 241 Ariz. at 268 ¶ 17 ("And the required 'overall assessment' permits consideration of deficits in the life-skill categories identified by medical clinicians." (citing *Grell II*, 212 Ariz. at 529 ¶ 62)). In addition to considering the three life-skill categories, Arizona also requires courts to conduct an "overall assessment of the defendant's ability to meet society's expectations of him." *Grell II*, 212 Ariz. at 529 ¶ 62.

¶17          Arizona's additional requirement of an "overall assessment," after the court considers the three life-skill categories, does not exceed the state's authority as recognized by the Supreme Court to define intellectual disability. The Court's chief concern is that a state will execute an intellectually disabled person in violation of the Eighth Amendment because the state's determination of whether an intellectual disability exists was not informed by commonly accepted principles from the medical community. *See Moore I*, 137 S. Ct. at 1044; *Hall*, 572 U.S. at 704; *Atkins*, 536 U.S. at 321. However, Arizona's framework for determining intellectual disability relies on those principles, thus *Moore I* and *Moore II* do not call Arizona's intellectual disability analysis into question.

**¶18**　　　Arizona's statute mitigates the risk of using unsound methods to determine intellectual disability by requiring experts evaluating a defendant's intellectual disability to have at least five years' experience in testing, evaluating, and diagnosing intellectual disabilities. § 13-753(K)(2), (4). And as previously identified, "each expert in intellectual disability shall examine the defendant using current community, nationally and culturally accepted physical, developmental, psychological and intelligence testing procedures, for the purpose of determining whether the defendant has an intellectual disability." § 13-753(E). Accordingly, Arizona's statute requires experts to consider current medical standards when evaluating intellectual disability as *Moore I* and *Moore II* mandate.

**¶19**　　　To the extent that Arizona's statutory scheme requiring an overall assessment departs from the medical community consensus, such deviation does not render § 13-753(K)(1) constitutionally infirm. *Moore I* prohibits courts from "disregard[ing] . . . current medical standards," 137 S. Ct. at 1049, but that does not require a court to merely defer to whatever medical diagnosis it deems most credible. The Diagnostic and Statistical Manual of Mental Disorders itself specifically recognizes the risk of solely relying on medical diagnostic information for a legal determination of intellectual disability. It states:

> [T]he use of DSM-5 should be informed by an awareness of the risks and limitations of its use in forensic settings. When DSM-5 categories, criteria, and textual descriptions are employed for forensic purposes, there is a risk that diagnostic information will be misused or misunderstood. These dangers arise because of the imperfect fit between the questions of ultimate concern to the law and the information contained in a clinical diagnosis. In most situations, the clinical diagnosis of a DSM-5 mental disorder such as intellectual disability . . . does not imply that an individual with such a condition meets legal criteria for the presence of a mental disorder of a specified legal standard. . . . For [a legal determination of intellectual disability], additional information is usually required beyond that contained in the DSM-5 diagnosis, which might include information about the individual's functional impairments and how these impairments affect the particular abilities in question.

DSM-5, *supra* ¶ 1 n.1, at 25. By requiring an overall assessment, Arizona law presents a flexible approach for determining intellectual disability capable of adapting to changes in the medical community. Neither § 13-753

nor our interpretation of the statute conflicts with current medical standards.

**¶20** Accordingly, to assess adaptive behavior for intellectual disability according to § 13-753(K)(1), our prior caselaw, and *Moore I* and *Moore II*, a court should first conduct an overall assessment by holistically considering the strengths *and* weaknesses in each of the life-skill categories (conceptual, social, and practical), as identified by the medical community, to determine if there is a deficit in any of these areas. Under this step, the court cannot offset weaknesses in one category with unrelated strengths from another category. *Moore I*, 137 S. Ct. at 1050 n.8. And although *Moore I* cautioned against overemphasizing adaptive strengths, a court should consider both a defendant's strengths and weaknesses within the life-skill categories. *Id.* at 1050; *see also* DSM-5, *supra* ¶ 1 n.1, at 25 (cautioning that there is an "imperfect fit between the questions of ultimate concern to the law and the information contained in a clinical diagnosis" and stating "additional information is usually required" for a legal determination of intellectual disability); AAIDD Guide, *supra* ¶ 1 n.1, at 1 ("Within an individual, limitations often coexist with strengths.").[3] Consideration of both strengths and weaknesses within each individual category is part of the necessary overall assessment for an intellectual disability determination in Arizona.

**¶21** If the court does not identify any deficits, the inquiry ends. However, if there is a deficit, the court should determine whether that deficit, in light of the individual's overall assessment of the life-skill categories, actually affects the defendant's ability to function with the "personal independence and social responsibility expected of the defendant's age and cultural group." § 13-753(K)(1). Only then can a court find a defendant has met the adaptive behavior prong necessary for proving an intellectual disability.

**¶22** Here, the trial court correctly considered Altamirano's strengths and weaknesses in the life-skill categories but did not conduct an

---

[3] To the extent the Supreme Court cautions against relying on behavior while in prison and cites the DSM-5, *Moore I*, 137 S. Ct. at 1050, we do not read the DSM-5 as prohibiting reliance on behavior in a controlled setting, like prison. Although the AAIDD counsels against the consideration of behavior while in prison, *see* AAIDD Guide, *supra* ¶ 1 n.1, at 20, the DSM-5 recommends "if possible" a court should consider "corroborative information reflecting functioning outside of those settings." DSM-5, *supra* ¶ 1 n.1, at 38.

overall assessment of how Altamirano's deficits affected his ability to meet the standards of personal independence and social responsibility for a person his age and cultural background. *Id.*

## CONCLUSION

**¶23**        Supreme Court jurisprudence instructs that states have the "task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences" upon the intellectually disabled. *Atkins*, 536 U.S. at 317 (quoting *Ford,* 477 U.S. at 405, 416–17). Although states have "some flexibility," *Moore I*, 137 S. Ct. at 1052, in enforcing this constitutional restriction, the adjudication of intellectual disability should be "informed by the views of medical experts," *Hall*, 572 U.S. at 721.

**¶24**        Arizona's statutory framework for adjudicating intellectual disability complies with the constitutional requirements announced in *Moore I* and *Moore II*. However, because the trial court did not conduct an overall assessment of Altamirano's ability to meet society's expectations of him as required by § 13-753(K)(1), we vacate the court of appeals' decision order, reverse the trial court, and remand for a new intellectual disability determination using the standard set forth in this opinion.